**DISCIPLINARY COUNSEL *v.* MCCORMACK.**

**[Cite as *Disciplinary Counsel v. McCormack,***

**133 Ohio St.3d 192, 2012-Ohio-4309.]**

*Attorneys—Violations of Code of Judicial Conduct and Rules of Professional Conduct—One-year suspension, stayed on conditions.*

(No. 2011-2055—Submitted January 18, 2012—Decided September 26, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 10-086.

_____

**Per Curiam**.

{¶ 1} Respondent, Thomas Arthur McCormack of Cleveland, Ohio, Attorney Registration No. 0015570, was admitted to the practice of law in Ohio in 1979. McCormack served as a magistrate in the Medina County Court of Common Pleas, Domestic Relations Division, until May 2009. On October 11, 2010, relator, disciplinary counsel, charged McCormack with multiple violations of the current and former Code of Judicial Conduct[1] and the Rules of Professional Conduct arising from his conduct as the magistrate presiding over multiple hearings in a postdecree domestic-relations case.

{¶ 2} The parties waived a hearing and submitted this matter to a panel of the Board of Commissioners on Grievances and Discipline on their stipulations as to facts, mitigating factors, exhibits, and violations of the Code of Judicial Conduct, as well as their joint motion in support of a six-month, fully stayed suspension. The panel found that there was clear and convincing evidence to

_____

1. McCormack was charged under both the current and former versions of the Code of Judicial Conduct because the charged conduct occurred before and after March 1, 2009, the effective date of the current code.

prove the stipulated violations and recommended that the board adopt the parties' stipulated sanction. The board adopted the panel report in its entirety.

{¶ 3} We adopt the facts and violations as stipulated by the parties, but based upon our concerns about the current state of McCormack's mental health, the absence of direct evidence from the professionals who had provided his early treatment, and the brief period of treatment he had received from the psychiatrist who testified in his behalf, we find that a one-year suspension, all stayed on conditions, is the appropriate sanction for McCormack's misconduct.

**Misconduct**

{¶ 4} In his role as a magistrate, McCormack was assigned to hear a postdecree motion to modify child support filed on November 26, 2007, in the matter of *Sejka v. Sejka*, Medina C.P. No. 06 DR 0097, and 13 additional motions filed by the parties through April 6, 2009, that covered various issues including custody, child support, visitation, and spousal support. During that span of time, McCormack conducted hearings on six separate days. At four of the six hearings McCormack conducted in the Sejka matter, he conducted himself in an impatient, undignified, and discourteous manner that was highly prejudicial to the administration of justice.

{¶ 5} At a July 17, 2008 hearing, which was a continuation of a hearing on a motion to modify child support, McCormack goaded attorney Joseph Stafford, Mr. Sejka's counsel, during his opening statement. McCormack asked whether Stafford would like to address contempt motions first, but when Stafford agreed that they could proceed with a contempt motion, McCormack responded, "You're whining and taking up our time, which is part of the reason we don't get to your client's case." And when Stafford mentioned the prior testimony of one of Mr. Sejka's witnesses, McCormack chided him for not properly subpoenaing the witness. Following an exchange with Stafford about discovery matters, Stafford asked McCormack to recuse himself, and McCormack replied, "Absolutely not.

Here, do you understand? I don't care. I really don't care. You're right. I don't care, Okay? [Your client] thinks the whole world's unfair. It's far beyond me."

{¶ 6} McCormack laughed and made a face at some of the questions that Stafford asked Ms. Sejka on cross-examination, and when Stafford stated that he did not find the laughter appropriate, McCormack replied, "I find it to be absolutely appropriate." McCormack answered a question that Stafford had directed to Ms. Sejka and then accused Stafford and his client of complaining when Stafford stated that McCormack's conduct made it difficult to question the witness. While Ms. Sejka was on the witness stand, McCormack questioned Mr. Sejka, who was seated at the counsel table, about his mortgage and his daughter's activities and then engaged in a general discussion with Mr. Sejka, Stafford, and Stephen Bailey, Ms. Sejka's counsel, in what Stafford described as a "free for all." At some point, Ms. Sejka asked if she could step down from the witness stand, and McCormack granted her request, but it is unclear whether the attorneys had finished questioning her. Thereafter, McCormack stated that he wanted to continue the hearing to the next day, and after a discussion with the attorneys, the hearing was continued to July 23, 2008.

{¶ 7} On July 23, however, rather than continuing with the hearing on modification of child support, McCormack began a hearing on school placement, even though no motion on that issue was before the court. McCormack overruled Bailey's objections to trying that issue without notice. After Bailey had cross-examined Mr. Sejka, McCormack asked the guardian ad litem for the parties' daughter if she had any questions. He permitted the guardian to lecture counsel and the parties on their behavior, and after she had stated that counsel and the parties made her ill, McCormack replied, "Here, you're walking down the street. You run into somebody in a wheelchair, handicapped. Do they make you sick?" The guardian replied, "No," and McCormack responded, "Oh, these gentlemen here, this is what they're capable of. Obviously, this is what they're capable of,

okay?" McCormack continued to explain that the parties would fight "no matter what."

{¶ 8} During this hearing, McCormack failed to rule on several of Stafford's objections, admonished Bailey to shut up, and accused him of being a liar. When McCormack threatened to hold Bailey in contempt, Bailey simply replied, "Your honor." Respondent then found Bailey in contempt, but at the conclusion of the hearing, he merely admonished Bailey.

{¶ 9} Bailey also asked McCormack to note on the record that the proceedings had heightened the tension between the parties. McCormack responded:

> I'm going to tell you what, Mr. Bailey. I'm going to tell you what. I didn't have a psychiatrist in here testifying that this kid's going downhill because of some proceedings in this Court. Those two people sitting there did it all by themselves, and to suggest otherwise is specious and nonsense, okay, and if that's the way you want to go, okay.

He also questioned Ms. Sejka extensively while she was on the witness stand and became argumentative with her, saying: "So it's a concern for you. It's not a concern for [your daughter]"; "Well, I really don't get it. Pardon me for being stupid"; and "If [your daughter] goes to another school she won't be able to have that, nonsense."

{¶ 10} A hearing was scheduled for December 16, 2008, to address various motions of the parties, but the testimony elicited during the hearing that day was never tied to a particular motion. Soon after the hearing began, McCormack instructed the parties to leave the room so that counsel could discuss settlement. On the record, Greg Moore (attending in Stafford's stead), Bailey, the

guardian, and McCormack discussed the parties' behavior, attitudes, and other issues, including the factors to be considered in determining child support.

{¶ 11} When the parties reentered the courtroom, McCormack asked them what they wanted, and Mr. Sejka stated that he wanted shared parenting. McCormack engaged in a lengthy discussion with Ms. Sejka about her former husband's feelings and motivations, focusing entirely on shared parenting without any mention of the motion to modify child support that was before the court. After Ms. Sejka expressed her frustration with the process and stated that custody had not been an issue until she asked for additional child support, McCormack said, "You're empowered by being the custodian, and you intend to remain that. That will remain to be seen on the 9th."  Ms. Sejka sought to explain her comment, but McCormack replied,

> Here, stop, control your client, counsel.  You know, I'm not listening to anyone else in this courtroom.  She don't want to settle it, okay?  I entered into this as a result of counsel talking about settlement.  She don't [sic] want to settle it, fine, but I don't want to hear about how I'm taking something away from her from inquiring into settlement.  I find that offensive and paranoid.

To which Bailey replied, "No, it's not paranoid," and the recording of the hearing ended abruptly.

{¶ 12} On April 10, 2009, McCormack conducted a hearing on an emergency motion for custody that had been filed by Mr. Sejka.  While Ms. Sejka was on the witness stand, McCormack questioned Mr. Sejka, who was seated at counsel table and was not under oath, about drug tests that had recently been taken by the parties, asking whether he had revealed the results of those tests to a third party.  Stafford referred to someone who had complained to the court about

earlier proceedings and how those complaints had influenced McCormack's demeanor during the hearing. McCormack became offended, and while laughing, said, "I like that. I like that. Here's what we're going to do. I'm vacating the [April 6, 2009] order [granting Mr. Sejka's ex parte emergency custody motion] and I'm shutting down this hearing and mother's parenting time will proceed." Stafford objected, noting that he had additional witnesses, but McCormack replied:

> Here, here, I really don't care. What you need to do now is take this up to my judge, okay, and explain to her how I did it all wrong. Six months from now when you get that hearing, we'll see how I dealt with it, and if it doesn't go well, you can spend the next two years taking it up to the Court of Appeals. You accuse me of something like that ever again, Mr. Stafford, and I will hold you in contempt and it will cost you a lot of money to get out of jail * * * allow me to assure you * * *.

McCormack then refused to allow Stafford to proffer information for the record and terminated the hearing.

{¶ 13} On May 29, Judge Mary Kovack of the Medina County Court of Common Pleas, Domestic Relations Division, declared a mistrial in the Sejka postdecree matter, stating that McCormack had "failed to allow the parties meaningful opportunity to present testimony and evidence on the issues" and indicating that the record before her did not allow her to resolve the pending issues. Further, the judge found that McCormack had improperly conducted a hearing on school placement when there was no motion pending on that issue and when the parties had no notice of the nature of the hearing.

{¶ 14} The parties stipulated and the panel and board found that the conduct that occurred before March 1, 2009, violated former Canon 1 of the Code of Judicial Conduct (requiring a judge to uphold the integrity and independence of the judiciary), Canon 2 (requiring a judge to respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), Canon 3(B)(4) (requiring a judge to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and to require similar conduct of lawyers, staff, court officials, and others subject to the judge's direction and control), and Canon 3(B)(8) (requiring a judge to dispose of all judicial matters promptly, efficiently, and fairly and to comply with the guidelines set forth in the Rules of Superintendence for the Courts of Ohio).

{¶ 15} The parties further stipulated and the panel and board found that McCormack's conduct after March 1, 2009, violated Jud.Cond.R. 1.2 (requiring a judge to act in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and to avoid impropriety and the appearance of impropriety), 2.2 (requiring a judge to uphold and apply the law and to perform all duties of the judicial office fairly and impartially), 2.5(A) (requiring a judge to perform judicial and administrative duties competently and diligently and to comply with guidelines set forth in the Rules of Superintendence for the Courts of Ohio), 2.6(A) (requiring a judge to accord every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law), 2.6(B) (permitting a judge to encourage parties to a proceeding and their lawyers to settle matters in a dispute but prohibiting a judge from coercing any party into settlement), and 2.8(B) (requiring a judge to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and to require similar conduct of lawyers, court staff, court officials, and others subject

to the judge's direction and control). The parties also stipulated and the panel and board also found that McCormack's conduct violated Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

{¶ 16} The record demonstrates that McCormack conducted himself in an undignified and discourteous manner, treated the litigants and their counsel with disdain, permitted the guardian ad litem to lecture the parties on the record, terminated hearings before the parties had presented all their evidence and had made a record of their objections, acted on his own whims rather than inquiring into the best interests of the child, failed to resolve any of the matters pending before him for more than a year and a half, and failed to conduct hearings in a manner that would permit the judge assigned to the case to resolve those issues in his stead. We therefore adopt the facts as stipulated by the parties and found by the panel and board.

### Sanction

{¶ 17} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 18} The parties stipulated and the board found that the following mitigating factors are present: (1) McCormack does not have a prior disciplinary record, (2) he provided full and free disclosure during the investigation and demonstrated a cooperative attitude in the disciplinary proceedings, and (3) he has been diagnosed with a mental disability by a qualified health-care professional and received treatment from Dr. Scott Martin, a psychiatrist, who has opined that

the mental disability contributed to the cause of the misconduct and that he can presently practice law in a competent, ethical, and professional manner without restraint. *See* BCGD Proc.Reg. 10(B)(2)(a), (d), and (g).

{¶ 19} The parties did not stipulate to any aggravating factors, and the board did not find that any aggravating factors are present. We find, however, that McCormack engaged in a pattern of misconduct involving multiple offenses—albeit in a single case—and caused harm to vulnerable litigants who bore the time commitment and expense of multiple hearings for well over a year without movement toward the resolution of their conflict. *See* BCGD Proc.Reg. 10(B)(1)(c), (d), and (h).

{¶ 20} The parties cite a number of cases in support of their recommendation of a six-month, fully stayed suspension. They note that in *Cleveland Bar Assn. v. Cleary*, 93 Ohio St.3d 191, 754 N.E.2d 235 (2001), we imposed a six-month suspension on a judge who had offered a pregnant criminal defendant a quid pro quo arrangement: if the defendant agreed to complete her pregnancy, she would be sentenced to probation, but if she planned to have an abortion, she would receive a prison term. We also imposed a six-month suspension on a judge who had violated multiple Canons of the Code of Judicial Conduct when he (1) served as the judge and testified as a witness in a criminal contempt proceeding, (2) found a woman in civil contempt and sanctioned her without filing a complaint, advising her of her right to counsel, or memorializing the proceedings with a journal entry, (3) relied on an outdated statute book to sentence a juvenile offender and engaged in ex parte communications with the juvenile-probation department, (4) conducted a probation-revocation hearing without counsel for the juvenile offenders being present, and (5) failed to recuse himself after instructing the prosecutor to bring felony charges against the two offenders. *Disciplinary Counsel v. Karto*, 94 Ohio St.3d 109, 760 N.E.2d 412 (2002).

{¶ 21} The parties, however, observe that the misconduct of Cleary and Karto was more egregious than that of McCormack because Cleary had manipulated a criminal defendant's freedom based on Cleary's personal beliefs and Karto's misconduct occurred in multiple cases involving multiple defendants and affected the freedom of some criminal defendants. In contrast, they argue, McCormack's impatient and discourteous demeanor made it difficult for the parties and counsel in a single matter to present their evidence and arguments to the court and delayed the resolution of that case.

{¶ 22} The parties recognize that we have imposed even more severe sanctions on judges who have exhibited similar unprofessional, discourteous, and impatient behavior, but argue that in those cases, the conduct was more egregious and pervasive and of longer duration than McCormack's. *See, e.g.*, *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556 (imposing an 18-month suspension with six months stayed on a judge with narcissistic-personality disorder whose acts of bias, coercion, intemperance, and dishonesty included jailing a gallery spectator for contempt without cause, presiding over a defendant's plea and sentencing after participating in his arrest, attempting to coerce plea agreements in criminal cases, humiliating a victim of domestic violence in court, and repeatedly mistreating participants in court proceedings), and *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286 (imposing a two-year suspension with one year stayed on conditions on a judge who, over a period of more than five years, engaged in coercive tactics to improperly influence disposition of criminal cases and engaged in a pattern of misrepresentation and rude, undignified, and unprofessional conduct that included abusive verbal outbursts, unjustified expulsions from the courtroom, and berating or humiliating persons in the presence of others). Furthermore, the parties argue, unlike Parker and O'Neill,

McCormack has presented mitigating evidence that demonstrates he suffered from anxiety and posttraumatic-stress disorder at the time of his misconduct.

**{¶ 23}** The parties suggest that McCormack's misconduct is most comparable to that in *Disciplinary Counsel v. Hoague*, 88 Ohio St.3d 321, 725 N.E.2d 1108 (2000), in which we imposed a six-month fully stayed suspension on a judge who misused the authority of his office to summon, intimidate, and reprimand two persons who he believed had recklessly and erratically driven an automobile in his presence.

**{¶ 24}** While we agree that McCormack's conduct is not as egregious as that of Cleary or Karto, or as extreme or pervasive as the conduct of Parker or O'Neill, we find that it is more serious than the single incident of misconduct at issue in *Hoague*. And although the evidence demonstrates that McCormack was diagnosed with anxiety and posttraumatic-stress disorder following his treatment for a life-threatening medical condition in 2005 and strongly suggests that his conditions contributed to cause his misconduct, we have some reservations about considering McCormack's mental-health disorders as a mitigating factor in this case. Specifically, we find that neither of the treatment professionals who testified on McCormack's behalf stated that his mental-health disorders contributed to cause his misconduct and that the only direct evidence of McCormack's mental-health treatment is limited to the few short months immediately before the parties agreed to the stipulations in this case.

**{¶ 25}** Dr. Philip Cusumano, one of McCormack's physicians, testified that McCormack was diagnosed with a serious heart condition that required surgical intervention in August 2005. The following month, he developed an infection that required additional surgery. He was first diagnosed with anxiety in October 2005 and was later diagnosed with posttraumatic-stress disorder and depression. Dr. Cusumano testified that McCormack's anxiety and stress reaction responded to medication and psychotherapy but that when he last saw him in

April 2009, McCormack was still suffering from these conditions. He believed that "McCormack probably had a short temper to begin with," but that "this tremendous stress he was under fueled those symptoms." Dr. Cusumano noted a report that McCormack had outbursts and agitation at home, and he testified that McCormack would have been particularly susceptible to outbursts of temper that he could not control when placed in highly stressful circumstances. He did not go so far as to say that McCormack's conditions contributed to cause the misconduct at issue in this case.

{¶ 26} Although Dr. Cusumano testified about McCormack's receipt of and positive response to treatment for his mental-health conditions, he acknowledged that he had not received any direct communications from the treating psychologist and concluded that "no news is good news." He also stated that he and his colleagues "had to really constantly work on getting [McCormack] to comply and follow up with any medical regimen, whether it was seeing a psychologist or whether it was seeing a medical doctor." Though he did not know whether McCormack had received continuing treatment for his mental-health issues, he stated that he would not be surprised to hear that McCormack had discontinued treatment.

{¶ 27} Dr. Martin testified that he began treating McCormack on January 7, 2011. McCormack presented himself as having experienced persistent anxiety for several weeks that caused difficulty sleeping, problems in his relationship with his wife, and fits of anger and rage. Although Dr. Martin diagnosed him with an adjustment disorder and anxiety, his symptoms were not severe enough to require medication. McCormack did, however, begin weekly psychotherapy sessions, and as he began to gain control over his anger, frustration, and rage, the frequency of those sessions was reduced to every two weeks. By April 22, 2011, Dr. Martin reported that McCormack was not significantly impaired at work. And at Martin's August 11, 2011 deposition, he testified that McCormack's anxiety,

posttraumatic-stress disorder, and depression had fully resolved, that he no longer had any primary psychiatric diagnosis, and that he is capable of competently, professionally, and ethically practicing law without the need for any ongoing psychotherapy or psychopharmacological medication. But when questioned about McCormack's diagnoses and their effect on his work prior to 2011, Martin testified that he did not know what McCormack was experiencing at that time.

{¶ 28} Although Dr. Martin did testify that McCormack has fully recovered from his mental-health disorders, we remain troubled by the relatively brief duration of his treatment relationship with McCormack—particularly in light of Dr. Cusumano's testimony that McCormack was not the most compliant of patients and the absence of any testimony or other direct evidence from other mental-health professionals who had treated him since his initial diagnosis in late 2005.

{¶ 29} Therefore, we find that the proper sanction for McCormack's misconduct is a one-year suspension, fully stayed on the conditions that he commit no further misconduct and that within 60 days of the effective date of this opinion, he (1) submit to a mental-health evaluation conducted by the Ohio Lawyers Assistance Program ("OLAP"), (2) enter into an OLAP contract, *if OLAP determines that treatment is necessary,* the duration of which shall be determined by OLAP, (3) complies with all OLAP treatment recommendations, and (4) serves a period of monitored probation in accordance with Gov.Bar R. V(9) until the expiration of his OLAP contract or 12 months from the effective date of this order, whichever occurs later. If McCormack fails to comply with the conditions of the stay, the stay will be lifted, and McCormack will serve the entire one-year suspension. Costs are taxed to McCormack.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Heather H. Coglianese, Assistant Disciplinary Counsel, for relator.

Mazanec, Raskin, Ryder & Keller Co., L.P.A., Todd M. Raskin, and Shawn A. Romer, for respondent.

_____